THE PEOPLE OF THE STATE OF NEW YORK, Complainant, *v.* ANNA
YERGAN, Defendant.

City Magistrates' Court of New York, Fifth District, August 4, 1937.

*Frank J. Ricca,* for the defendant.

BROMBERGER, C. M.   The defendant has been found guilty of
disorderly conduct in violation of subdivision 2 of section 722 of
the Penal Law, and a motion is made by her attorney for an arrest
of judgment.   This motion is denied.

The testimony establishes that from about two to two-twenty A. M., on July 29, 1937, this defendant stationed herself at the curb at or near the intersection of Seventh avenue and One Hundred and Thirteenth street, Manhattan. Upon change of the traffic signal light, she walked from the curb, partly across the roadway on two separate occasions, respectively, to two automobiles which had been stopped by the signal light thus set against them in each instance. In the first instance, after the signal light had again changed, the automobile whose driver had been thus accosted by the defendant proceeded on its way. The defendant then returned to the curb, waited until the signal light, changing again, halted the second machine. She then contacted the driver of the second automobile, who, after some conversation, alighted and followed or accompanied the defendant into a house on Seventh avenue.

This citizen testified that he had never before met the defendant; that in accosting him she had spoken to him first, asking him for a ride or to " give her a lift;" that upon his assent she then suggested that she would like to get " a bag or something;" that thereupon he alighted and accompanied the defendant to her apartment or room; that the defendant then remarked it was too late to go for a ride, to which the witness agreed; that some conversation between him and the defendant then occurred, of a character not clearly disclosed in the evidence but, according to the witness' attitude and testimony, of a suggestive character; that he was thereupon about to leave or in the act of leaving when the officer entered. This witness further testified that he was not pleased upon being thus accosted by the defendant but that he was not annoyed.

It is somewhat difficult to reconcile the two reactions; but to my mind it is clear, in observing the witness as he testified before me, that he had been highly embarrassed by the occurrence, the first of that particular character to which he had ever been subjected.

The officer testified to the two instances, the conduct of the defendant and the manner in which she had approached these two automobiles and to his conversations with the defendant and with the other witness in her presence and in which she participated.

The defendant failed to take the stand or to introduce any testimony in her own behalf.

A motion to dismiss the complaint was made at the close of the People's case and denied. The defendant was found guilty as charged, remanded and a medical examination ordered as well as an investigation by a probation officer. The results of both the examination and inquiry are now before me.

The defendant appears for sentence.

The probation report indicates a previous offense for violation of subdivision 4, clause a, of section 887 of the Code of Criminal Procedure on February 22, 1936, for which this defendant was placed on probation for one year by Magistrate KROSS. The fingerprint record indicates an additional conviction in November, 1936, under the name of Anna Strode, for disorderly conduct (annoyance), for which she received a suspended sentence.

The history of disorderly conduct and the various statutes defining it are ably reviewed in several recognized authorities. (*Matter of Twelve Commitments*, 19 Abb. Pr. 394; *Cohen* v. *Warden of Workhouse*, 150 N. Y. Supp. 596; *People* v. *Lipschitz*, 120 Misc. 633; Pamphlet by Magistrate HOUSE, N. Y. L. J. Feb. 28, 1910, p. 2251, and cited in *Adams* v. *Schwartz*, 137 App. Div. 230, 233; Cobb on Inferior Criminal Courts Act, p. 135 *et seq.*)

In view of these exhaustive and readily available historical references, it becomes unnecessary to retrace the origin and development of those statutes. Suffice it to note that their statutory derivation in this State is found in Laws of 1833, chapter 11, wherein it is also provided (§ 5) that driving a horse through the city streets at more than five miles an hour constitutes disorderly conduct. The statutes governing disorderly conduct today are similar, with some modifications and additions, to this enactment of 1833.

Mr. Justice BIJUR (*People* v. *Lipschitz, supra*), quoting Judge HOLMES, succinctly thus establishes a rule governing disorderly conduct: " In offenses of this kind the standard is that of what Judge HOLMES in his ' Common Law ' calls ' the average member of the community ' observing the ' current morality.' "

Conduct which tends to a breach of the peace is, within certain limitations, a matter of discretion on the part of the magistrate. And this must necessarily be so if law, order and ordinary decency in so large a metropolis as the city of New York are to be maintained. (*People* v. *Lipschitz, supra; Matter of Twelve Commitments, supra; People* v. *Nixon*, 248 N. Y. 182.)

It is immaterial whether any breach of the peace actually occurred or whether the persons affected by the defendant's conduct were actually annoyed. (*People* v. *Lipschitz, supra; People* v. *Squires*, 135 Misc. 214; *People* v. *Sinclair*, 86 id. 426; Cobb, *supra*, p. 136, and cases there cited.)

The words " tending to a breach of the peace " or " by which a breach of the peace may be occasioned " mean such behavior on the part of one which *might* be resented either forcibly or by loud and boisterous language, regardless of what action, in fact, is taken by those who are subjected to it. (*People* v. *Cohen*, 136 N. Y. Supp. 163.)

It is also sufficient as a *prima facie* case to show that acts interfered or tended to interfere with another. (*People* v. *Wecker*, 140 Misc. 388, and cases there cited.)

In determining whether or not the conduct is of a disorderly character within the purview of the statute, the court may take into consideration all the surrounding circumstances; the place or places where the offense occurred; the time of the day or night; the manner in which it occurred; the lack of previous acquaintance of the parties with each other; the repetitious and systematic conduct of the defendant, and all other elements presented by the testimony. (*People* v. *Phillips*, 245 N. Y. 401.)

Judge CARDOZO in *People* v. *Gerks* (243 N. Y. 166) lays down the rule as follows (p. 170): "Repetition reduces the likelihood of mistake or mere coincidence. We miss the evidence of system when we ignore the succession and concentrate our gaze upon the isolated acts. (1 Wigmore, Evidence, §§ 302, 321, p. 637.)"

The same principle in somewhat different language is enunciated in *People* v. *Marrin* (205 N. Y. 275) and in *People* v. *Sharp* (107 id. 427).

It may also be observed that while the court in determining the guilt of this defendant before it did not take into consideration the fact that she failed to introduce any testimony in her own behalf or failed to take the stand, it nevertheless directs attention to the principle, well established in this State, that while no such inference of guilt may be drawn from the failure of the defendant to take the stand, the court is warranted in taking the facts and circumstances which, if innocent, she might have controverted and explained, most strongly against her. (*People* v. *Smith*, 114 App. Div. 513; appeal dismissed, 187 N. Y. 557; *People* v. *Trombino*, 238 App. Div. 61; affd., 262 N. Y. 689.)

The evidence, to my mind, clearly establishes defendant's interference or conduct which tended to interfere with citizens in a systematic, premeditated and typical manner.

The defendant's conduct was such that a breach of the peace might have been occasioned thereby. Whether or not the citizen who was last contacted, and who appeared as a witness upon the trial, was actually annoyed or not is immaterial. He testified that he was not pleased. Either or both of these motorists might have resented the defendant's approach.

Further, in considering whether or not a breach of the peace might have been occasioned, it is common knowledge that women are often employed as decoys to lure men into places where, under circumstances similar to these, they are attacked or robbed or whereby other breach of the peace may be occasioned.

It may be urged that men should be wary and if they accompany women of this type under these circumstances they do so at their peril. However, laws are made to protect the unwary as well as the wary; the careless as well as the careful; the foolish as well as the wise.

In 1833 the community was relatively small; transportation was slow; visitors from any distances were rare; and certainly mechanical traffic regulatory systems and automotive vehicular traffic were than non-existent. Today the city is a community of seven million inhabitants, to which probably several more millions of visitors or transients annually may be added. Conventions, World's Fair and other attractions, many sponsored by the public authorities themselves, invite strangers to the city. To a large extent the automobile is used as a means of transportation by these visitors for their journey and during their sojourn here.

These visitors alone, disregarding for the moment large numbers of our own residents, are largely, if not totally, unfamiliar with certain conditions which exist in a large metropolis of this character. In many instances, being young men and women, they lack the experience and perception of more mature years. Ignorance or credulity may easily make them victims of lure, enticement or decoy.

The court holds it the duty of the authorities of this city, acting within the law, to protect not alone our own residents but those who are thus invited or come otherwise temporarily to sojourn here.

It is further the observation of this court, although it is not a fact in this instance, where women have been convicted of disorderly conduct of this and similar character and subsequently physically examined, that at least approximately ninety per cent of them are infected with one or more types of virulent and highly infectious venereal diseases. The court has also observed in its experience that some of these women, knowing themselves to be thus infected, and with utter indifference and criminal disregard of the hygienic security of the men they contact, approach and seek to entice these men into sexual relationship with them.

The evidence in this case is not sufficient to establish either prostitution or solicitation. The only recourse upon the part of those charged with the responsibility of maintaining law, order and decency under such circumstances is to this charge of disorderly conduct.

The people of Harlem are decent, law-abiding citizens who themselves resent and seek to remedy these conditions. Improvement has been made; but if the law be not vigorously enforced a situation may here develop akin to pre-Lexow days, when women openly stationed themselves on the streets, on the steps of their

houses, in their windows, and engaged in less directly enticing conduct than is presented in the cases that have appeared before me.

Any laxity in enforcement encourages those depraved characters who employ these women in their operations or for their own profit, and simplifies their illegal activities.

Upon the entire evidence presented by this record, I am satisfied of the defendant's guilt and deny the motion for an arrest of judgment. So far as this particular defendant is concerned, she has been confined for six days. She has two previous convictions on her record. However, she is not now infected and I am inclined to grant her another opportunity, invoking some deterrent element.

Accordingly, I impose a sentence of sixty days in the workhouse and suspend the execution of that sentence during the defendant's future good behavior.